# UNITED DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

JAMES E. GRADDY, JR.,      )
                              )
          Plaintiff,        )
                              )
vs.                         )     Case No. 4:07CV1422 RWS/AGF
                              )
MICHAEL J. ASTRUE,       )
Commissioner of Social Security,   )
                              )
          Defendant.     )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This action is before this Court for judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff James E. Graddy, Jr., was not disabled and, thus, not entitled to disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. The action was referred to the undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(b) for recommended disposition. For the reasons set forth below, the Court recommends that the decision of the Commissioner be reversed and that the case remanded for further consideration.

Plaintiff, who was born on January 28, 1955, filed for disability benefits on September 12, 2003, at the age of 48, claiming a disability onset date of February 1, 2003, due to chronic back pain, heart problems, memory loss, depression, anxiety, numbness in his legs and hands, and asthma. His application was denied at the initial administrative level on April 9, 2004, and Plaintiff did not seek further review. Plaintiff

filed another application on September 27, 2004, asserting the same ailments and disability onset date. This claim was initially denied on December 20, 2004. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") and such a hearing was held on August 18, 2006. On October 10, 2006, the ALJ issued his decision, noting that he had reopened the prior application and denial determination. The ALJ concluded that Plaintiff was able to perform his past relevant work as a drafter, and was thus not disabled. Plaintiff requested review of the ALJ's decision by the Appeals Council of the Social Security Administration and submitted additional evidence for the Appeals Council to consider. The Appeals Council stated that it considered the additional evidence, and denied the request for review on June 25, 2007. Plaintiff has thus exhausted all administrative remedies and the ALJ decision of October 10, 2006, stands as the final agency action now under review.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence. Specifically, Plaintiff argues that the ALJ erred, especially in light of the additional evidence submitted to the Appeals Council, in finding that Plaintiff's mental impairments were not severe and in assessing Plaintiff's residual functional capacity ("RFC"). Plaintiff requests reversal of the ALJ's decision and remand for further proceedings.

**Work History and Application Forms**

Plaintiff wrote in forms submitted with his application for benefits that from May 1980 to May 1986 he worked at a manufacturing company, from February 1990 to May 1998 he was an assistant plant manager, from May 1998 to October 1998 he worked in

another manufacturing company, from December 1998 to February 2000 he worked as a software engineer and mechanical engineer, from March 1990 to May 2001 he worked as a drafter for an engineering concern, and from October 2001 to February 2004 he worked as a service technician on kitchen equipment. Id. at 125, 164. Plaintiff described his responsibilities at the drafting job as being in charge of plant production, supervising eight people. He reported that at this job he walked for eight hours a day, stood for one hour, never sat, handled large and small objects for eight hours, lifted up to 100 pounds, and lifted 50 pounds frequently. Id. at 125-26. Plaintiff's earnings records from 1989 forward show annual earnings of approximately $17,000 to $26,000 through 1995; approximately $30,000 in 1996, 1997, and 1998; minimal earnings in 1999; approximately $36,000 in 2000, $6,000 in 2001, $31,000 in 2002, and $13,000 in 2003; and minimal earnings in 2004. Id. at 94.

On his application forms, Plaintiff (who was 6' tall and weighed 220 pounds) reported that he had completed two years of college. Id. at 98, 102. On an agency questionnaire completed by Plaintiff on May 10, 2006, he wrote that he lived alone, and had completed 14 years of education, including one year of college (1978-79) and one year of vocational rehabilitation (1977-78). He wrote that he could not stand for more than 15 minutes, walk for more than 25 minutes, lift and carry things weighing more than 20 pounds "for very long 3-4 times," or sit for more than 20 minutes, all due to pain. He wrote that he could no longer ride his horse, although he did not sell them yet, and could no longer go hunting. During an ordinary day, he read, cooked, surfed the Internet,

played cards, and did some personal engineering work "developing machines and tolls" for businesses he had worked for in the past. He wrote that he was unable to work due to bipolar disorder, deep depression, and the physical limitations he had noted. Id. at 156-58.

**Medical Record[1]**

Medical reports from July 2003 that reviewed Plaintiff's past medical history indicate that in 1975, while in the military, Plaintiff dislocated his left shoulder and several lumbar discs when he lifting a heavy object; that in 1977, Plaintiff was in an accident that permanently damaged his thumbs/thumb sockets; and that in 1994 he was diagnosed with carpel tunnel syndrome and reported pain in his knees, elbows, and wrists. Id. at 173, 781, 906. The record indicates that Plaintiff received medical care through the Veterans Administration ("VA") based upon a 60 % disability rating related to his military service.

On February 22, 2002, Plaintiff went to the emergency room ("ER") due to palpitations and lightheadedness while driving. He was diagnosed with atrial fibrillation and released on February 25, 2002. Id. at 1398-99. Medical progress notes dated March 8, 2002, state that Plaintiff screened positive for depression and that a psychology consult was being requested. Id. at 299. On March 25, 2003, Plaintiff informed a nurse that he was on short-term disability from his job driving a truck and needed a statement that he

---

[1]    The Court notes that many medical reports and progress notes appear in the record twice.

could return to work or that he should continue off work until after his follow-up appointment a month and a half later. Plaintiff also rescheduled a MRI that he had missed due to drowsiness from Gabapentin.[2]

The next day, Salvador Cruz-Flores, M.D., wrote that based on Plaintiff's initial neurological outpatient visit, which showed no neurological involvement, there were no reason for Plaintiff to remain off work. Id. at 274. On March 31, 2003, however, the nurse Plaintiff had spoken to directed Plaintiff to remain off work until after the completion of an MRI and the neurology follow-up on April 11, 2003. Id. at 331.

An MRI of the lumbar spine conducted on April 8, 2003, showed mild degenerative disc disease ("DDD) and bilateral spondylosis at L5-S1, with no large disc herniation or canal stenosis. Id. at 165. An x-ray taken on April 22, 2003, showed no evidence of pulmonary pathology or tumor mass. Id. at 168-69. On July 2, 2003, Plaintiff was placed on a Holter monitor (used to detect transient cardiac arrhythmias) for 24 hours. Some minor incidents were noted, but the overall report indicated that Plaintiff's condition was benign. Id. at 251-52.

Progress notes dated July 17, 2003, indicate that Plaintiff saw psychiatrist James Kerr, D.O., for medication renewal. Plaintiff reported that his mood fluctuated, and that he went to court the previous day for a divorce. Dr. Kerr indicated that Plaintiff was oriented with intact judgement, but that his mood and affect were depressed. Plaintiff

---

[2]    Gabapentin (Neurontin) is an anti-seizure medication that is also used to treat certain types of pain arising from nerve damage.

was assigned a Global Assessment of Functioning ("GAF") score of 63.[3] His current medications were listed as Tylenol (regular and with codeine), Albuterol (an inhaler), Oxaprozin (a non-steroidal pain reliever and anti-inflamatory), aspirin, Rabeprazole (an anti-ulcer drug), Gabapentin, Triamcinolone (a steroid used to treat many different conditions), Metoprolol (used to treat high blood pressure, chest pain related to coronary artery disease, and arrhythmia), and Paroxetine (Paxil; used to treat depression and anxiety).  Id. at 248-50.

On July 28, 2003, Plaintiff was admitted to a VA hospital with complaints of chest pain, dizziness, and shortness of breath.  Plaintiff reported five months of similar pain with symptoms that would last between four and six hours.  Id. at 904.  On his second day of admission, Plaintiff had an acute episode of chest pain that he rated a six out of ten.  A chest x-ray showed no evidence of pulmonary infiltrate or tumor mass.  Plaintiff's chest pain was alleviated and an EKG showed that the fibrillation resolved itself spontaneously. Upon discharge on July 30, 2003, Plaintiff was diagnosed with non-cardiac chest pain, most likely due to anxiety; atrial fibrillation; anxiety; depression; and chronic low back pain.   He was encouraged to notify a psychiatrist and psychologist of

---

[3]     A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations.  Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32.  GAF scores of 31 to 40 indicate "[s]ome impairment in reality testing or communication or "major" impairment in social, occupational, or school functioning; scores of 41 to 50 reflect "serious" impairment in these functional areas; scores of 51 to 60 indicate "moderate" impairment; scores of 61 to 70 indicate "mild" impairment.

his hospitalization.  Id. at 172-75.

On August 20, 2003, Dr. Cruz-Flores wrote that Plaintiff had no lesions on his spine, and that therefore there was no reason to keep Plaintiff off work.  Id. at 213. During a September 17, 2003 follow-up to the July hospitalization, Plaintiff related that he continued to have the same symptoms of chest pain, shortness of breath, and syncopal episodes almost daily after exertion, with symptoms lasting between two and four hours and relieved by rest.  Id. at 207-08.

The next day Plaintiff met with VA psychologist Fredric Metzger, Ph.D., for an "ongoing therapy session."  Dr. Metzger speculated that  Plaintiff's chest pain, for which there was no identified physical etiology, might be the result of anxiety and a panic disorder, although the link to exertion was not typical of panic disorder.  Plaintiff discussed his ambivalence regarding seeking Social Security disability insurance; although he believed that his various medical conditions prevented him from maintaining full-time competitive employment, he did not want to be labeled as "totally disabled." Dr. Metztger recommended that Plaintiff enroll in a pain management group.  Id. at 394. Plaintiff participated in such a group led by Dr. Metzger on September 29, 2003, at which time Dr. Metzger diagnosed depression and "pain disorder associated with psychological factors and a general medical condition."  Id. at 395.  Dr. Metzger reported on October 10, 2003, that at his therapy session that day, Plaintiff described a general improvement in mood and energy levels, which Plaintiff attributed to his increased acceptance of his divorce and his participation in therapy.  Nevertheless, Plaintiff expressed concern

because the previous week had been worse than the week prior to that; and Dr. Metzger explained that the recovery process of depression could include small relapses. Id. at 397.

Plaintiff did not attend the pain management group on October 20, 2003, and was sent a letter asking him to resume. Id.

On October 30, 2003, Plaintiff was diagnosed by Michael Olson, P.A. (Physician's Assistant), with cardiac dysrhthmia, asthma, and low back pain with radiculopathy. Id. at 200. On November 14, 2003, Plaintiff was seen by VA psychiatrist Patrick Oruwari, M.D., for an initial consultation and evaluation. Plaintiff reported depression that "comes and goes," noting that it was hard for him not to think about his current social situation (lost home, evicted twice) and health problems. Plaintiff denied anxiety or panic attacks. Dr. Oruwari diagnosed major depressive disorder in partial remission, possible ("rule out") chronic adjustment disorder, and a GAF score of 65. Id. at 194-98.

The results of a Holter monitor on November 28, 2003, showed rare to infrequent arrhythmias. Id. at 193. Plaintiff was admitted to the hospital on February 28, 2004, with chest pain and was discharged the next day with a diagnosis of precordial chest pain and anxiety. Id. at 423-30. On March 10, 2004, Plaintiff reported during an audio evaluation consult that he felt "unbalanced" for about two and a half years. The audiogram indicated that Plaintiff was eligible for a left ear aid.

On March 12, 2004, Plaintiff returned to see Dr. Metzger after a six month hiatus because Plaintiff had increased feelings of depression, fatigue, and worry about his heart

condition. Dr. Metzger noted that initially Plaintiff had a difficult time focusing, had difficulty maintaining a conversation, and gave fragmented responses. Plaintiff told Dr. Metzger that a friend was willing to help him by setting up a web page to advertise some of Plaintiff's work. Dr. Metzger noted that there were no changes to Plaintiff's diagnosis, treatment plan, or medication. Id. at 948-49.

The results of an auditory brainstem response evaluation conducted on March 16, 2004, indicated mild high-frequency sensorineural hearing loss in the right ear, moderate to moderately severe high-frequency sensorineural hearing loss in the left ear, but no retrocochlear pathology. Id. at 186-88.

During a session with Dr. Oruwari on June 28, 2004, Plaintiff stated that he experienced episodes of depression that lasted between one to two days, that he was never sure if he would wake up to a good day or not, and that he worried a lot about everything. Dr. Oruwari assessed anxiety and possible bipolar disorder. Id. at 176 -78.

The record includes a Report of Contact completed by a counselor at the state disabilities determinations agency dated November 1, 2004. In addition to reviewing his alleged physical disabilities with him, the counselor noted that Plaintiff reported that he had been taking Paxil for depression/bipolar disorder. Plaintiff was not sure if the Paxil was helping. He stated that he cried, but thought this was partly due to memory problems; that he had no trouble getting along with people; and that he had concentration problems and rarely finished anything. The counselor noted that during the phone contact, Plaintiff wanted to "TALK, TALK, and TALK!" Id. at 133-34.

On November 18, 2004, B.J. Kerbyson, D.O., examined Plaintiff in connection with his application for disability benefits. Dr. Kerbyson reported that Plaintiff had a normal gait, normal range of motion and strength of his full body, with a reduced grip strength on his left hand. Plaintiff was able to button, write his name, pick up coins without difficulty with either hand, and stand on one leg without difficulty. Dr. Kerbyson noted that Plaintiff complained of back pain during range of motion testing of the hips and lumbar spine. Dr. Kerbyson summarized that Plaintiff tested negative for radiculopathy in a straight leg test, had some range of motion abnormalities, showed no evidence of weakness or nerve root compression nor evidence of upper motor neutron lesion, had well preserved grip strength and fine manipulation bilaterally, and showed tenderness of the left paraspinal muscles and spinous processes of the lumbar spine. Id. at 466-70.

Marsha Toll, Psy.D., a non-examining state agency consultant, completed a Psychiatric Review Technique form on December 17, 2004. She opined that Plaintiff had an anxiety-related disorder and affective disorder, but that these impairments were not severe. Dr. Toll indicated that Plaintiff was only mildly limited in maintaining concentration, persistence, or pace; had no limitations in activities of daily living and maintaining social functioning; and had had no episodes of decompensation of extended duration. Id. at 474-84.[4]

Plaintiff was admitted to a VA hospital on January 12, 2005, for prolonged chest

_____

[4]    Also on December 17, 2004, a non-medical consultant completed a . Id. at 136-44. The report mentions a diagnosis of moderate obesity.

pain. On January 14, 2005, psychiatrist Eve Lipschitz, M.D., saw Plaintiff at the hospital. Plaintiff told Dr. Lipschitz that he stayed up for three or four days without sleep and then slept for 36 hours in a repeating cycle. He stated that he had earned three degrees in mechanical, electrical, and hydraulic engineering and was registered with the State, but upon further questioning, stated that his degrees were not bachelor's degrees but were a type of certificate. Plaintiff reported to Dr. Lipschitz that despite receiving disability benefits for a back injury, he worked 50 to 60 hours a week, seven days a week, inventing things such as gadgets for concrete, railroad, or automotive work. Id. at 622-26. Plaintiff was discharged from the hospital on January 14, 2005, with a diagnosis of atrial fibrillation. Id. at 763.

Later that month, on January 28, 2005, Plaintiff complained to Dr. Cruz-Flores about persistent back pain. Dr. Cruz-Flores adjusted Plaintiff's pain medications, but also noted that Plaintiff said he felt like he wanted to die. While Plaintiff denied suicidal thoughts, the Dr. Cruz-Flores was concerned and took Plaintiff to the ER for a psychiatric evaluation. Id. at 758. The record does not contain any direct evidence of Plaintiff's admission to the hospital, but later medical notes indicate that he was admitted and that while there, he was tapered off Paxil and started on Wellbutrin instead. Tr. at 751.

During a psychiatric outpatient session with Dr. Oruwari on February 11, 2005, Plaintiff recounted that one minute he would think everything was okey, and then the next minute he would begin to cry. When he told Dr. Oruwari that he did not know what to do, he began to cry. Plaintiff stated that despite his education, he could not balance a

checkbook, and that his disability money (presumably from the military) was not enough. Plaintiff expressed a desire to see his therapist more frequently. Dr. Oruwari indicated that Plaintiff's appearance, thought,, memory, speech, insight, judgment, and intelligence were all normal, while Plaintiff's mood and affect were abnormal. Dr. Oruwari diagnosed bipolar disorder. Id. at 751-52.

Plaintiff returned to the ER on February 15, 2005, complaining of chest tightness and discomfort, which he believed resulted from working too hard the past weekend. He was referred to gastroenterology where a colonoscopy was scheduled and he was discharged later that day. Id. at 743-45. On February 16, 2005, a nurse fielded an urgent call from Plaintiff who stated that he had been unsteady for the last two hours. Id. at 742. On May 4, 2005, the colonoscopy report came back with normal findings. Id. at 741.

At a scheduled visit with Dr. Oruwari on May 11, 2005, Plaintiff reported a variable mood, "more down," and admitted to death wishes. Dr. Oruwari diagnosed bipolar disorder, noted that the need to check for "adjusting dose of Depakote [a drug used to treat bipolar disorder]," and instructed Plaintiff to return to the clinic for follow up in three months. Id. at 732-33. Plaintiff was seen for a medications review on May 12, 2005, at which time he admitted that he frequently forgetting to take his medications, but said that he now used a pill box which was helping him. Id. at 731.

On June 13, 2005, Plaintiff tearfully called the psychiatry clinic and asked to speak to Dr. Oruwari because he felt overwhelmed and confused as to what to do with his feelings. Plaintiff stated that he was preoccupied with feeling of grief relating to his

divorce. He also stated that he had not been totally compliant with his medication due to forgetfulness. An appointment was set for June 21, 2005, for Plaintiff to begin therapy with a social worker; Plaintiff missed this appointment, and a new appointment was set for July 27, 2005. Id. at 729-30.

Meanwhile, Plaintiff called a nurse on June 29, 2005, to report that his leg pain was worsening and that Gabapentin was not working. Id. at 729. On July 25, 2005, Plaintiff had a neurology consult for worsening lower back pain. He reported that he was able to bend over, but had to do so slowly. He stated that no one would hire him due to his back problems, and that he felt like he wanted to go to sleep and not wake up. The diagnostic impression was that Plaintiff had a lot of low back pain, and that his spondylolishtesis might have worsened. The plan was to obtain a repeat MRI of the lumbar sacral spine and bending spine x-rays. Plaintiff was started on methocarbomol and a TENS unit[5] for his back pain, in addition to his many other current medications, and a referral for physical therapy was made. In light of Plaintiff's suicidal thinking, and the controversy over a possible link between Gabapentin and such thinking, use of this drug was to be gradually ended. Id. at 609-12. On August 25, 2005, Plaintiff missed an appointment for a physical therapy evaluation. Id. at 723.

On September 26, 2005, Plaintiff was admitted to a VA hospital for chest pain,

---

[5]    TENS (Transcutaneous Electrical Nerve Stimulation) is a treatment for pain in which pads are placed near the area of pain and electrical pulses are sent via the pads through the skin along the nerve fibers. The pulses suppress pain signals to the brain.

which he assessed as a four or five out of ten, lightheadedness, and dizziness. He stated

that he did not sleep well the previous night because he was worrying about his choice

between having a pacemaker implanted or undergoing cardioversion. Progress notes

document that Plaintiff decided against getting a pacemaker because he wanted to continue

welding. Id. at 681-83. An MRI of the lumbar spine showed no interval change with

Grade 1 spondylosisthesis at L5-S1, bilateral spondylolysis at L5 and a normal spinal

canal with no evidence of spinal stenosis or disc herniation. Id. at 531. The next day

Plaintiff restarted his psychiatric medication after spontaneously crying during a physical

assessment. Id. at 706. A stress myocardial perfusion study that day showed no

significant perfusion abnormality. Id. at 694. On October 1, 2005, Plaintiff was released

from the hospital. Id. at 658-59.

On October 31, 2005, Stephen Brenner, M.D., released Plaintiff from neurology. A

an MRI of Plaintiff's lumbar sacral spine showed no changes over the last few years, and

Dr. Brenner doubted that surgery could do much to relieve Plaintiff's pain. Plaintiff was

referred to physical therapy for a TENS unit, and back to his primary care provider for

continued pain management. Dr. Brenner noted that Plaintiff reported that he had been

unable to work for several years due to back pain, but that he still did design work for

railroads, as he was an engineer by profession. Id. at 657.

On January 27, 2006, Plaintiff returned to see Dr. Oruwari, whom Plaintiff had last

seen in May 2005. Plaintiff was out of his anti-depressant medication and had been

depressed lately to the point where the "slightest little thing" affected him and he was

overly emotional.  Dr. Oruwari noted a depressed and tearful mood, and an abnormal affect, with other factors (e.g., memory, orientation, judgement) being normal.  Dr. Oruwari diagnosed a current GAF score of 50.  Id. at 644-47.  On March 7, 2006, Plaintiff's medications for his mental problems were continued, but were changed to long-acting formulas because of concerns about his daily compliance.  Citalopram (an antidepressant) was added, as Plaintiff's depression seemed to be "quite severe."  Plaintiff inquired about a clinic for post-traumatic stress disorder, stating that he was having terrible flashbacks and that the news upset him very much.  Id. at 505-06.

**Evidentiary Hearing of August 18, 2006**

Plaintiff and a vocational expert ("VE") testified at the hearing.  Plaintiff testified that he lived with his daughter, who accompanied him to the hearing, and her husband and two children.  Plaintiff received medical care through the VA and his only source of income was his VA disability pension, based upon his service-related 60% disability rating.  He testified that he finished high school and received additional education in drafting, for which he did not receive any certificates or diplomas.  Id. at 1534-37.

Plaintiff testified that he worked from the early 1990s to 1998 in drafting, engineering, and "doing the drawings on machines."  He served as plant manager during the last two years of this job, until the company moved out of state.  In 1998 and 1999 he worked for another company as a maintenance manager until that company downsized.  In 2000, Plaintiff worked testing software at an engineering company until the project was completed.  From 2001 to February 13, 2003, he was a service technician for a

commercial kitchen equipment company. Plaintiff drove a utility van and would go to clients' kitchens to repair their equipment. Plaintiff testified that he was let go from this position due to the side effects of his medications (sleepiness and dizziness), his heart condition, and his back pain. He stated that his employer told him that he was too much of a liability driving a vehicle. Also, he was not able to take all his tools from the van to the house in one trip due to their weight, and customers grew frustrated when he took several trips to his van to get tools, which extended the service time. Id. at 1538-42.

Plaintiff testified that he took a six-week medical leave at the end of 2002, due to his heart condition and problems with his medications, resulting in dizziness and sleepiness. He collected disability payments (presumably from his employer), and went back to work in February 2003, but only worked for five days before he was terminated. Plaintiff stated that he had fallen twice in the last 30 days due to dizziness. Plaintiff stated that his health problems were a back injury from the military, a broken left shoulder, "broken thumbs" with damaged sockets, and a rapid heartbeat and atrial fibrillation. His thumb situation, which he was told could be surgically repaired at a cost of $13,000 per hand, made it difficult to hold onto things for "very long" and to grasp "something as simple as a coffee cup" that did not have a handle. Plaintiff testified that he declined a pacemaker because if one were inserted, he would not be able to weld or watch welders, his hobby. Id. at 1543-45.

Plaintiff related that he was diagnosed with depression and anxiety. ("One minute good and the next minute I'm not.") He stated that he had recently had an anxiety attack

when he was late for an appointment with his attorney.  He explained that this was why his daughter drove him to the hearing.  Plaintiff asserted he was not able to preform any of his previous jobs because he could not sit for more than 30 minutes due to back pain, and that this pain led to concentration problems.  Counsel pointed out that Plaintiff was currently sitting on the edge of his chair with his hand on the table, and Plaintiff explained that it would hurt if he sat back in the chair, and that his shoulder would fall out of its socket if he did not rest his hand on something.  Id. at 1545-48.

Plaintiff testified that he took Methacarbamol (a sedative with musculoskeletal relaxant properties) daily for back pain, which caused dizziness and drowsiness; Omeperazole for acid reflux; Metoprolol, which caused sleepiness and dizziness; Acetaminophen; Clonazepam as a sleep aid; Singulair for allergies; Oxoprozin, which caused dizziness such that he had to lie down for about an hour each morning after taking it; Diavalproex (Depakote) as a mood stabilizer for depression; and aspirin and Amiodarone for his heart.  Id. at 1548-50.

Plaintiff testified that he experienced constant back pain that fluctuated from a six to a nine out of ten throughout the day.  At this point in the hearing, Counsel commented that Plaintiff was shifting in his chair and Plaintiff stated that he needed to stand for a little bit, which the ALJ allowed.  Plaintiff stated that his pain affected his ability to concentrate and stay on task, and that due to his pain he continually had to reposition himself, such that he would divide an eight-hour day between standing, sitting, and lying down.  During an eight-hour day, he could sit for a total of about three hours before he needed to

reposition himself due to the pain.  Id. at 1551-55.

Plaintiff attested to depression so severe that 12 out every 30 days he did not want to get out of bed, so he would only get up in the morning to let his dogs out.  His physical pain persisted and he was only able to twist, bend, or stoop once or twice a day.  Plaintiff testified that his thumbs were out of their sockets, which made it difficult to manipulate certain objects and tools, that his thumbs fatigued easily, and that he was "always dropping stuff."  Plaintiff testified that he dropped glasses of water so frequently that he stopped carrying them.  Plaintiff also stated that he had short term memory loss.  He testified that he could not remember what he did last week and that days ran together.  Id. at 1556-60.

The ALJ questioned Plaintiff regarding the statement in Dr. Lipschitz's January 13, 2005 report that Plaintiff "is on disability for a back injury but works 50 to 60 hours a week 7 days a week inventing things."  Plaintiff responded that this described what he did from 1990 to 1998 at the engineering company.  Id. at 1562-64.

The ALJ then cited Dr. Metzger's March 12, 2004, statement, which mentioned that Plaintiff spoke to a friend who might be willing to help him create a web page to advertise his work.  Plaintiff explained that, indeed, a friend had planned to help him in 2000 and 2001 when Plaintiff was trying to develop equipment for the railroad industry, but there was no interest in the project and "everything folded."  The ALJ questioned Plaintiff regarding Dr. Brenner's entry on October 31, 2005, that Plaintiff complained of persistent back pain so severe that he could not work for several years, but admitted that

he was doing design work for railroads. Plaintiff testified that at that time, and through November 2005, he was designing his own equipment for the railroad industry, working at his computer "a couple times a day" for a "couple hours," but that he was not able to get anyone interested in the designs. Id. at 1564-66.

The ALJ asked Plaintiff if he was still engaged in the daily activities that he had described in his May 10, 2006 questionnaire. Plaintiff testified that his response to the questionnaire was accurate when he completed it, but that he no longer did these activities. Plaintiff testified that in May 2006 he spent, "at the most," an hour or so twice a week doing design work. Id. at 1566.

Plaintiff testified that in a typical week, he drove approximately 20 miles to places such as church and the grocery store. He spent no time with friends and the only card game he played was solitaire, which he had not played for about a year. Plaintiff testified that he did not carry his own groceries from the store to his car and that he took many trips from his car to his home to bring in the bags. He estimated that at most he carried ten pounds at a time. Id. at 1569-71.

The VE then took the stand and described Plaintiff's previous positions of maintenance manager, plant manager, and production manager as light skilled work; appliance repair-person as medium semi-skilled work; and drafter as sedentary skilled work. The VE testified that a person of Plaintiff's age, education, and work history with the limitations Plaintiff described would be unable to sustain work. The ALJ posed a hypothetical question of whether a person with the same vocational factors as Plaintiff

could find work as a drafter if he could stand or walk for only two hours a day; sit six hours a day; lift ten pounds occasionally; occasionally push and pull, stoop, crouch, squat, kneel, and crawl; and should avoid climbing, balancing, heights, hazardous unprotected moving equipment, extreme dust, fumes, poor ventilation, and repetitive or prolonged overhead reaching. The VE responded that there were occupations at the skilled or semi-skilled level that such an individual could perform, such as drafter. The ALJ questioned whether such a person who was limited to occasional gripping, handling, and fingering would be able to be a drafter. The VE answered that such a person would not be able to be a drafter. Id. at 1571-73.

The ALJ proceeded to ask whether a hypothetical person could perform other skilled or semi-skilled work if limited to sedentary activity with occasional gripping, handling, and fingering. The VE testified that as such a person would have management skills, and could perform the job of division manager, which covered a wide variety of industries and which existed in significant numbers locally and nationally. The VE testified that a person with Plaintiff's past work experience would require no significant specific vocational preparation ("SVP") for change within the same industry. The VE testified that Plaintiff had the necessary core skills to be able to perform this job within 30 days, even though he would need to make minor adjustments for specific company procedures. The ALJ asked whether such a hypothetical person who was not tolerant of high stress; not able to handle fast paced activity, quotas, and deadlines; not able to handle a high level of concentration such as sustained decision making or attention to detail; and

limited to simple routine repetitive tasks would be able to perform the job of a drafter or a division manager.  The VE answered in the negative.  The VE also testified that if the person in the previous hypothetical question also suffered from dizziness, and was required to lay down for two to three hours in an eight-hour work shift, he or she could not work as a drafter or a division manager.  Id. at 1571-77.

**ALL's Decision of October 10, 2006**

The ALJ found that Plaintiff suffered from the severe impairments of recurrent atrial fibrillation/flutter, asthma, degenerative disc disease of the lumbosacral spine, history of thumb fracture, and a history of recurrent shoulder dislocation.  The ALJ, however, found that the record did not establish any mental impairment that more than minimally impacted Plaintiff's ability to perform work-related activity on any ongoing basis while Plaintiff was compliant with prescribed treatment and medication.  The ALJ then concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the deemed-disabling impairments listed in the Commissioner's regulations.  Id. at 21.

After summarizing the record, the ALJ found that Plaintiff had the RFC to lift and/or carry up to ten pounds frequently; stand and/or walk for up to two hours in an eight-hour day; sit for up to six hours in an eight-hour day; and occasionally bend, stoop, crouch, squat, kneel, crawl, or push and/or pull.  In addition, Plaintiff had to avoid climbing and balancing, heights, hazards, repetitive overhead reaching, and extremes of environmental pollutants.  Id.

Noting that under <u>Polaski v. Heckler</u> subjective complaints may be discounted if there are inconsistencies in the record as a whole, the ALJ listed numerous inconsistencies the ALJ found between Plaintiff's statements on his application forms and his testimony at the hearing, and between Plaintiff's testimony and the medical record. The ALJ also noted internal inconsistencies in Plaintiff's testimony. For example, the ALJ noted that on Plaintiff's application he wrote that he had two years of college and professional training and certifications, but at the hearing he testified that he had only a high school education and did not have any additional certifications. <u>Id.</u> at 25-26.

As another example of an inconsistency, the ALJ stated that Plaintiff's application forms and the May 10, 2006 questionnaire showed that he could lift up to 20 pounds, but at the hearing Plaintiff testified that he could only lift eight to ten pounds. The ALJ also pointed out that Plaintiff testified at the hearing that he had to lie down for at least three hours during an eight-hour period because of the side effects of his medications, but, according to the ALJ, the medical records did not show that Plaintiff had alleged this severe of a problem to his treating doctors. The ALJ likewise observed that Plaintiff alleged at the hearing that his depression was so severe that 12 days out of the month he would do nothing except feed his dogs, yet he did not report such severe depression to his treating sources. Another inconsistency was noted between Plaintiff's hearing testimony that he could not hold things because of his thumbs, and the fact that Plaintiff had been able to work for many years since the injury to his thumbs, with no evidence of any worsening of this condition. <u>Id.</u> at 26.

The ALJ acknowledged that Plaintiff had depression and anxiety for which he received "some" treatment and medication. But the ALJ stated that the evidence indicated that Plaintiff had only mild restrictions in activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in concentration, persistence or pace; and no episodes of decompensation of extended duration. In arriving at this conclusion, the ALJ noted that the most reliable evidence of Plaintiff's level of mental functioning was Plaintiff's reports of his ailments to his physicians, as reflected in medical progress notes, because such reports were contemporaneous with the problems and were for the purpose of medical treatment. In addition, the ALJ gave "significant" weight to Dr. Toll's December 17, 2004 conclusion that Plaintiff's mental problems were not severe. The ALJ stated that Plaintiff's treatment for his mental problems was "sporadic," that there were periods of non-compliance with treatment and medications, and that when Plaintiff complied with prescribed treatment and medication, he functioned well. In sum, the ALJ found no severe mental impairment. Id.

The ALJ concluded that, "comparing [Plaintiff's RFC] with the physical and mental demands of this work," Plaintiff had the RFC to perform his past relevant work as a drafter as generally performed in the national economy. The ALJ stated that although Plaintiff performed this work at a heavy exertional level, one's past relevant work was considered not only as one performed it, but also as it was generally performed in the national economy, and the Dictionary of Occupational Titles ("DOT") defined drafter as having a sedentary exertional requirement. Accordingly, the ALJ concluded that Plaintiff

was not disabled, as defined in the Social Security Act, from the alleged onset date through the date of the ALL's decision.  Id. at 27.

**Evidence Presented to the Appeals Council**

Plaintiff submitted two new reports by examining consultants to the Appeals Council: a psychological evaluation by Sharon McGehee, Psy.D., dated December 14, 2006; and a medical assessment by David Paff, M.D., dated January 29, 2007.

Dr. McGehee diagnosed Plaintiff with post-traumatic stress disorder; bipolar disorder, most recent episode mixed, severe without psychotic features; borderline personality disorder; atrial fibrillations; gastroesophageal reflux disease; ulcers; chronic pain in the shoulder and back; an inability to lift more than ten to 20 pounds; problems with primary support system, with multiple losses over the last several years; problems with access to healthcare and a lack of funds to pay for needed medications; and a current GAF score of 40.  Id. at 1524-27.

In a Medical Source Statement - Mental, Dr. McGehee listed post-traumatic stress disorder and borderline personality disorder as Plaintiff's major diagnoses, and his prognosis as poor.  She opined that Plaintiff was markedly limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and workweek without interruption from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods; and set realistic goals or make plans independently of others.  She opined that he was moderately limited in his ability to

24

maintain attention and concentration for extended periods, sustain an ordinary routine without supervision, work in coordination with or proximity to others without being distracted by them, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  Id. at 1528-30.

Dr. McGehee indicated her belief that the medical impairments she noted had already lasted or could be expected to last at least 12 months, and that Plaintiff was not a malingerer.  She also opined that Plaintiff was likely to be absent from work as a result of his symptoms or required treatment more than four days per month.  Dr. McGehee checked a box labeled "Limitations assessed are verified as of the date of this evaluation only."  She indicated that in making her findings, she relied upon her examination of Plaintiff, clinical test results, and credible subjective reports of Plaintiff.  Id. at 1530-31.

Dr. Paff diagnosed Plaintiff with lower back pain with sciatica, secondary to degenerative disc disease; degenerative arthritis in the thumbs; recurrent subluxation in the left shoulder; and depression.  Dr. Paff indicated that depression and anxiety contributed to the severity of Plaintiff's problems, and that Plaintiff was only capable of low stress jobs.  Dr. Paff reported that Plaintiff could walk for six city blocks before needing to rest, sit and stand for 30 minutes at a time, and stand or walk for about two hours and sit for about four hours in an eight-hour day; needed to lie down every four hours for 20 minutes; could rarely twist, stoop, climb stairs, or crawl; and could frequently handle, grip, finger and feel.  Dr. Paff opined that Plaintiff's condition had reached this level of severity and

functional limitation in February 2003.  Id. at 1511-17.

In response to Plaintiff's request for administrative review, As noted above, the Appeals Council stated that it had considered the additional evidence, and found that this information did "not provide a basis for changing the [ALJ's] decision."  Id. at 7.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole."  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted).  This "entails 'a more scrutinizing analysis'" than the substantial evidence standard.  Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)).  The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'"  Id.  (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001) (citation omitted)).  Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'"  Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) (citation omitted)).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12

months.  42 U.S.C. § 423(d)(1)(A).  Work which exists in the national economy "means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  Id. § 423(d)(2)(A).  Both the impairment and the inability to engage in substantial gainful employment must last or be expected to last for not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 217-22 (2002).

The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability.  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If so, benefits are denied.  If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments.  A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities.  20 C.F.R. § 404.1521(a).  A special technique is used to determine the severity of mental disorders.  This technique calls for rating the claimant's degree of limitations in four areas of functioning: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  Id. § 404.1520a(c)(3).

If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied.  If the impairment is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in Appendix 1.  If the claimant's impairment is equivalent to a listed impairment, the claimant is conclusively presumed to be disabled.  Otherwise, the Commissioner asks at step four whether the

claimant has the RFC to perform his past relevant work, if any, either as he actually performed it, or as is generally required by employers in the national economy. If the claimant has past relevant work and is able to perform it, he is not disabled. If he cannot perform his past relevant work or has no past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors – age, education, and work experience.

If a claimant can perform the full range of work in a particular category of work (very heavy, heavy, medium, light, and sedentary) listed in the Commissioner's regulations, the Commissioner may carry this burden by referring to the Guidelines, which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment. Where a claimant cannot perform the full range of work in a particular category listed in the Guidelines due to nonexertional impairments such as pain or depression, the Commissioner cannot carry this burden by relying exclusively on the Guidelines, but must consider testimony of a VE.

The Appeals Council is required to consider new and material evidence submitted after the ALJ's opinion if it relates to the period on or before the date of the ALJ's decision. 20 C.F.R. §§ 404.970(b). The Eighth Circuit interprets a statement by the Appeals Council that additional evidence "did not provide a basis for changing the ALJ's decision" as a finding that the evidence in question was not material. Aulston v. Astrue,

No. 07-1780, 2008 WL 2066019, at *1 (8th Cir. May 16, 2008) (per curiam) (citing

Bergmann v. Apfel, 207 F.3d 1065, 1069-70 (8th Cir. 2000) (noting that whether

additional evidence meets criteria of materiality is a question of law that courts review de

novo; to be material, evidence must be relevant to the claimant's condition for the time

period for which benefits were denied, and must not merely detail after-acquired

conditions or post-decision deterioration of pre-existing conditions)).

    In the Eighth Circuit, the role of the court is to factor in such evidence and

determine whether the ALJ's decision was still supported by substantial evidence,

requiring the court to speculate as to how the ALJ would have weighed the newly-

submitted reports had they been available at the initial hearing.  Flynn v. Chater, 107 F.3d

617, 621-22 (8th Cir. 1997); Mackey v. Shalala, 47 F.3d 951, 953 (8th Cir. 1995); Jones v.

Astrue, No. 4:07-CV-4026, 2008 WL 360678, at *3 (W.D. Ark. Feb. 8, 2008).

**ALJ's Finding that Plaintiff's Mental Impairment was not Severe**

    Plaintiff argues that the ALJ committed reversible error in determining at step two

of the sequential evaluation process that Plaintiff's did not have a "severe" mental

impairment, as the term "severe" is used in the Commissioner's regulations.  Plaintiff

argues that Dr. McGehee's report, in conjunction with Plaintiff's treatment history for,

and testimony about, his depression/anxiety, clearly shows that Plaintiff's mental

impairment was "severe."  Plaintiff contends that the Court should remand the case with

instruction that the ALJ acknowledge that Plaintiff met his burden at Step Two of showing

a severe mental impairment, and that the ALJ then proceed to a full and fair analysis of

Plaintiff's mental impairment at Step Three, Step Four, and, if needed, Step Five of the evaluation process.

The Commissioner argues that Dr. McGehee's evaluation and opinion provides no basis for remand in this case, because Plaintiff saw her for the first and only time two months after the ALJ's October 10, 2006 decision. The Commission points to Dr. McGehee's representation that the limitations she assessed were verified as of the date of her evaluation only. Thus, the Commissioner argues, if Plaintiff believes his mental impairment is severe, his recourse is to file a new application for benefits alleging a disability beginning after the date of the ALJ's decision. The Commissioner relies on Sullins v. Shalala, 25 F.3d 601, 604-05 (8th Cir. 1994), which held that a psychiatric report dated one month after the ALJ's decision was too late to be considered.

"An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities. If the impairment would have no more than a minimal effect on the claimants ability to work, then it does not satisfy the requirement of step two." Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007). It is the claimant's burden to establish that an impairment is severe. Id. "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard . . . ." Id. at 708.

Here, the Court concludes that Plaintiff met his burden of establishing a severe mental impairment which the ALJ should have taken into account in formulating Plaintiff's RFC. The Commissioner's reliance on Sullins is misplaced. In that case

30

the claimant had not alleged depression as a disability in his applications or at the evidentiary hearing. In <u>Mackey</u>, 47 F.3d at 953, the Eighth Circuit specifically limited <u>Sullins</u> to such a situation. Here, Plaintiff alleged depression on his application for disability benefits as an impairment contributing to his inability to work; reported to the agency counselor on November 1, 2004, that he could not work due to his mental, as well as physical problems; submitted medical records related to this allegation; and testified at the hearing regarding his mental condition.

It is true that Dr. McGehee checked the box labeled "Limitations assessed are verified as of the date of this evaluation only," but a review of the record strongly suggests that her findings apply to at least part of the period covered by the ALJ's decision. <u>See</u> <u>Cunningham v. Apfel</u>, 222 F.3d 496, 502 (8th Cir. 2000) (holding that timing of post-hearing examination by plaintiff's psychologist, who opined that the claimant was disabled due to depression, was not determinative as to whether the evidence was material; although examination was post-hearing, it related to a condition that existed during the time period in question). Upon review of the entire record, including Dr. McGehee's report, the Court concludes that the case must be remanded for the ALJ to reconsider the severity of Plaintiff's alleged mental impairment, taking into account Dr. McGehee's report. <u>See</u> <u>id.</u> at 501-02 (holding that ALJ's decision that plaintiff was not disabled was not supported by substantial evidence on the record as a whole where RFC determination and question posed to the VE did not include any mental limitations, and new material evidence submitted to the Appeals Council indicated that plaintiff suffered from serious

depression, evidence which was supported by plaintiff's treatment history); <u>Bond v. Astrue</u>, No. 4:07-CV-04056, 2008 WL 2328346, at *5 (W.D. Ark. June 4, 2008) (reversing and remanding decision that plaintiff was not disabled where ALJ found that plaintiff's depression and bipolar disorder were not severe, without sufficiently developing the record, even though last comment by plaintiff's treating psychiatrist, who had prescribed dugs for depression and anxiety, was that plaintiff was doing "much better"); <u>cf.</u> <u>Kirby</u>, 500 F.3d at 707 (holding that ALJ did not err in determining that claimant's depression was not severe where claimant did not allege depression on his application and never had any professional mental health treatment on any long-term basis, and only medical opinion that plaintiff's alleged psychiatric problems prevented him from working was that of a consultant based largely on plaintiff's complains and conflicted with other consultant's opinion).

**<u>ALJ's RFC Assessment</u>**

In a related argument, Plaintiff asserts that the ALJ failed to relate his RFC findings to evidence in the record, and further, that those findings, specifically, the absence of any mental limitations, are not supported by substantial evidence in the record as a whole. Plaintiff points out that Dr. Toll was not a treating or examining source and that her December 17, 2004 findings were based upon an incomplete record.

A disability claimant's RFC is the most he or she can still do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). In <u>McCoy v. Schweiker</u>, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite work-

related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Id. at 1147. The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Although a claimant's RFC is determined at step four of the sequential evaluation process, where the burden of proof rests on the claimant, the ALJ bears the primary responsibility for determining a claimant's RFC. Id.

Here, as noted above, the ALJ's RFC determination did not include any restrictions due to mental impairment. The Court agrees with Plaintiff that the ALJ's reliance on Dr. Toll's Psychiatric Review Technique form is problematic. This report was completed before Plaintiff's admission to the hospital in January 2005 for psychiatric reasons; before Dr. Oruwari's February 11, 2005 diagnosis of bipolar disorder, diagnosis of a GAF score of 50 on January 27, 2006, and continued treatment of Plaintiff; and before Plaintiff's call to the psychiatry clinic on June 13, 2005. It is true that the record indicates that Plaintiff was not totally complaint with his psychiatric medications at certain points in time. But the Court does not believe that there is substantial evidence in the record as a whole to support the ALJ's assertion that when Plaintiff complied with prescribed treatment and medication, he functioned well (such that impairment was not "severe," as that term is defined in the Commissioner's regulations).

On remand, Dr. Paff's report should also be considered, and an explanation of the weight it is accorded. Further, in reconsidering Plaintiff's RFC, Plaintiff's mental and physical impairments must be considered in combination. See 20 C.F.R. § 404.1523; Social Security Ruling 96-8p, 1996 WL 374184, at *5 (when assessing an individual's RFC, the ALJ "must consider an individual's impairments, even those that are not 'severe'"; when considered in combination, "the limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do"); Cunningham, 222 F.3d at 501 (holding that the ALJ must consider "the combined effect of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient medical severity to be disabling").

## CONCLUSION

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be **REVERSED** and that the case be **REMANDED** for further consideration consistent with this memorandum and Order.

The parties are advised they have eleven (11) days to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained**.**

AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated this 19th day of August, 2008

34